O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

EVA JANE SCHULTZ,                  ) Case No. EDCV 12-0989-JPR
                                   )
                Plaintiff,         )
                                   ) MEMORANDUM OPINION AND ORDER
          vs.                      ) AFFIRMING THE COMMISSIONER
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social             )
Security,[1]                       )
                                   )
                Defendant.         )
                                   )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' cross-motions for judgment on the pleadings, which the Court has taken under

---

[1]     On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on November 29, 1953.  (Administrative Record ("AR") 119, 132.)  She has a college education.  (AR 43, 119.)  She worked as an instructional aide and remained on call throughout the administrative proceedings as a substitute teacher.  (AR 42, 151, 156.)

On October 22, 2009, Plaintiff filed an application for DIB, which the Social Security Administration treated as including an application for SSI.[2]  (AR 132, 62.)  Plaintiff alleged she had been unable to work since January 1, 2009, because of scoliosis; problems with her back, tailbone, shoulders, knees, and rotator cuffs; cellulitis;[3] asthma; allergies; gastroesophageal reflux

---

[2]    Although the ALJ treated Plaintiff's claim as one for DIB only (AR 25), Plaintiff asserted that she also sought SSI (AR 40-41, 67, 119), and the Agency treated her claim for benefits as including an application for SSI (AR 62; Def.'s Mot. at 1 n.1). As the Court affirms the finding that Plaintiff is not disabled, the type of benefits sought is irrelevant.

[3]    Cellulitis is a bacterial infection of the skin and underlying tissues that is treated with antibiotics.  <u>See</u> <u>Cellulitis</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ cellulitis.html (last updated Aug. 26, 2013).

disease ("GERD");[4] anemia; rosacea;[5] and possible attention deficit disorder ("ADD") and attention deficit hyperactivity disorder ("ADHD").  (AR 142, 151, 155.)  After Plaintiff's applications were denied, she requested a hearing before an administrative law judge.  (AR 62-66, 71-74, 83.)  A hearing was held on January 31, 2011, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 36-59.)  In a written decision issued on February 15, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 25-32.)  On April 17, 2012, the Appeals Council denied Plaintiff's request for review.  (AR 1-3.)  She was represented by counsel during the Appeals Council proceedings.  (See AR 5-7, 213-16.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

---

[4]    GERD is a condition in which the lower esophageal sphincter does not close properly, allowing the contents of the stomach to leak back into the esophagus, causing irritation, heartburn, and other symptoms.  See Gastroesophageal reflux disease, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001311/ (last updated Aug. 11, 2011).

[5]    Rosacea is a condition affecting the skin and sometimes the eyes.  See Rosacea, MedlinePlus, http://www.nlm.nih.gov/medlineplus/rosacea.html (last updated Oct. 11, 2013).  Rosacea can cause skin redness, acne, swelling of the nose, thickening of the skin, irritated eyes, and vision problems.  Id.

742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.   The Five-Step Evaluation Process**

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is

currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[6] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the

---

[6]    RFC is what a claimant can do despite existing exertional and nonexertional limitations.  §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at
828 n.5; Drouin, 966 F.2d at 1257.

B.    The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since January 1, 2009.  (AR 27.)
At step two, the ALJ concluded that Plaintiff had medically
determinable impairments of asthma, obesity, and mild
degenerative disc disease but that these impairments were not
severe.  (Id.)  Accordingly, the ALJ determined that Plaintiff
was not disabled.  (AR 32.)

**V.   RELEVANT FACTS**

A.    Medical Records[7]

Between May 23, 2003, and April 18, 2006, Plaintiff was seen
at West Dermatology in Redlands, primarily for treatment of
rosacea and verruca.[8]  (See, e.g., AR 129, 220, 222, 223, 224.)

---

[7]    Many of Plaintiff's medical records predate the amended
alleged onset date of January 1, 2009; however, as these records
were discussed in the ALJ's decision, they are detailed here.
See Williams v. Astrue, 493 F. App'x 866, 868 (9th Cir. 2012)
(noting that although medical opinions that predate alleged onset
of disability are of limited relevance, ALJ must consider all
medical opinion evidence).

[8]    Verruca is a type of wart.  See Warts, PubMed Health,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001888/ (last
updated Nov. 20, 2012).

Plaintiff's rosacea appeared to improve with application of Noritate cream[9] and ingestion of tetracycline.[10]  (See AR 223, 224, 226.)  Her warts were removed using liquid nitrogen.  (See AR 219, 220, 222, 223.)

On August 4, 2006, Plaintiff was seen in the emergency department of Verde Valley Medical Center in Cottonwood, Arizona, for complaints of discomfort in her left lower leg.  (AR 238.) Plaintiff was diagnosed with cellulitis, given a prescription for Keflex,[11] and referred for a follow-up visit in California within three to five days.[12]  (AR 239.)

On January 30, 2008, Plaintiff was seen by nurse practitioner Emmanuel Angeles at the Beaver Medical Group in Yucaipa for complaints of plugged ears and nasal infection.  (AR 244.)  The consultation form reflects diagnoses of otalgia,[13]

---

[9]    Noritate is a brand name for metronidazole, used to treat redness and pimples caused by rosacea.  See Metronidazole (On the skin), PubMed Health, http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMHT0011195/?report=details (last updated Apr. 1, 2013).

[10]    Tetracycline, or TCN, is an antibiotic.  See Tetracycline, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682098.html (last updated Sept. 1, 2010).

[11]    Keflex is a brand name for the antibiotic cephalexin. See Cephalexin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682733.html (last updated Sept. 1, 2010).

[12]    Plaintiff has described a four-day hospitalization in 2006 for treatment of cellulitis (see, e.g., AR 45; Pl.'s Mot. at 10), but the record reflects only same-day treatment and discharge (AR 237).

[13]    Otalgia is earache.  Stedman's Medical Dictionary 1287 (27th ed. 2000).

asthma, and rhinitis.[14]  (Id.)  The recommendations and prescriptions are illegible.  (Id.)

On April 8, 2008, Plaintiff was seen by Dr. Glenn Kerr at Beaver Medical Group with complaints of a cough for more than two weeks, a runny nose, and "troublesome" ears.  (AR 243.)  Her asthma, which had "been well controlled," was worse.  (Id.)  Dr. Kerr assessed bilateral otitis media,[15] bronchitis, and asthma and prescribed Zithromax[16] and Bactroban[17] and refilled Plaintiff's Astelin prescription.[18]  (Id.)

On April 16, 2008, Plaintiff was seen by Dr. Teri Boon at Beaver Medical Group for complaints of cough and congestion for two weeks and fever.  (AR 242.)  A test for streptococcus was

---

[14]    Rhinitis is inflammation of the nasal mucous membrane. Stedman's Medical Dictionary, supra, at 1566.

[15]    Otitis media is an infection or inflammation of the middle ear.  See Otitis Media, NIH Pub. No. 97-4216 (Oct. 2000), available at http://www.nidcd.nih.gov/StaticResources/health/ healthyhearing/tools/pdf/otitismedia.pdf.

[16]    Zithromax is a brand name for the antibiotic azythromycin.  See Azythromycin, MedlinePlus, http://www.nlm.nih. gov/medlineplus/druginfo/meds/a697037.html (last updated Oct. 15, 2012).

[17]    Bactroban is a brand name for mupirocin, an antibiotic used to treat skin infections.  See Mupirocin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688004.html (last updated Sept. 1, 2010).

[18]    Astelin is a brand name for azelastine, an antihistamine used to treat hay fever and allergy symptoms, including runny nose, sneezing, and itchy nose.  See Azelastine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a697014.html (last updated Oct. 30, 2013).

1   negative.  (AR 245.)  She was assessed as having pharyngitis[19] and
2   bronchitis; the prescription given is illegible.  (Id.)

3        On May 7, 2008, Plaintiff was seen by Dr. Paul Pham at the
4   Beaver Medical Group for complaints of redness in her lower
5   extremities over a couple of days.  (AR 241.)  Dr. Pham noted
6   that one leg showed slight erythema, the other showed edema and
7   erythema extending almost to her knee, and she had notable
8   varicose veins.  (Id.)  He assessed "[c]ellulitis, lower
9   extremity, possible phlebitis," prescribed Keflex, and advised
10  Plaintiff to keep her leg elevated and be seen again within the
11  week.  (Id.)

12       On July 25, 2008, Plaintiff was seen at West Dermatology for
13  complaint of a rash on her lower extremities.  (AR 218.)  The
14  notes reflect a diagnosis of "early cellulitis."  (Id.)
15  Plaintiff was prescribed Duricef[20] and triamcinolone ointment[21] and
16  instructed to elevate her legs, "[a]void prolonged car travel,"
17  and go to the emergency room if the condition worsened.  (Id.)

18       On June 10, 2009, Plaintiff was seen by nurse practitioner

---

19       [19]   Pharyngitis is inflammation of the mucous membrane and
underlying parts of the pharynx, which links the mouth and nasal
cavities to the esophagus.  Stedman's Medical Dictionary, supra,
at 1361.

20       [20]   Duricef is the brand name for the antibiotic
cefadroxil.  See Cefadroxil, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a682730.html (last updated Sept. 1,
2010).

21       [21]   Triamcinolone is used to treat itching, redness,
dryness, and other symptoms of various skin conditions.  See
Triamcinolone Topical, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a601124.html (last updated Oct. 1,
2010).

1  Ivana Bluhm at Redlands Community Hospital Family Clinic in
2  Redlands to obtain a prescription for Flonase.[22]  (AR 250.)
3  Plaintiff's Adult Health History reported that she had suffered
4  rosacea, ear-wax buildup, asthma, anemia, a pinched nerve in her
5  hip, and GERD and that her current medications were Flonase,
6  Prilosec,[23] iron tablets, and albuterol[24] "as needed."  (AR 251.)
7  Plaintiff reported to Bluhm that she could no longer afford a
8  corticosteroid inhaler[25] but that her asthma was "controlled
9  [with] Flonase," which could be obtained at lower cost.  (Id.)
10 Bluhm assessed Plaintiff as suffering from asthma, noted that she
11 was not wheezing, and provided a prescription and paperwork to
12 enable her to obtain low-cost Flonase.  (Id.)

13

14    [22]    Flonase is the brand name for fluticasone nasal spray,
15 used to treat the symptoms of rhinitis, including sneezing and
   stuffy, runny, or itchy nose.  See Fluticasone Nasal Spray,
16 MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
   meds/a695002.html (last updated Sept. 1, 2010).
17
18    [23]    Prilosec is a brand name for omeprazole, used to treat
   GERD.  See Omeprazole, MedlinePlus, http://www.nlm.nih.gov/
19 medlineplus/druginfo/meds/a693050.html (last updated Jan. 15,
   2013).
20
21    [24]    Albuterol is a bronchodilator, used to prevent and
   treat wheezing, shortness of breath, coughing, and chest
22 tightness caused by such lung diseases as asthma.  See Albuterol
   Oral Inhalation, MedlinePlus, http://www.nlm.nih.gov/
23 medlineplus/druginfo/meds/a682145.html (last updated Sept. 1,
   2010).
24
25    [25]    Corticosteroid inhalers are used to prevent swelling of
   a patient's airways.  See Chronic obstructive pulmonary disease -
26 control drugs, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
   ency/patientinstructions/000025.htm (last updated May 29, 2012).
27 Corticosteroids must be used daily to be effective.  Id.
   Flovent, which Plaintiff reported she used twice daily to control
28 her asthma (see AR 190), is an inhaled corticosteroid.  See
   Chronic obstructive pulmonary disease - control drugs, supra.

1   On October 6, 2009, Plaintiff followed up with Bluhm.  (AR
2   249.)  Plaintiff complained of cellulitis but denied any fever
3   and sought refills of prescriptions for cephalexin[26] and
4   metronidazole cream.  (Id.)  Bluhm assessed her as having
5   elevated blood pressure, cellulitis in her left lower leg, and
6   rosacea.  (Id.)  Bluhm instructed Plaintiff to keep a blood-
7   pressure log and bring it to her next visit, provided
8   prescriptions for cephalexin, metronidazole, and compression
9   stockings, and directed Plaintiff to elevate her leg twice daily[27]
10  for 10 to 15 minutes.  (Id.)

11      In a November 5, 2009 letter to the Department of Social
12  Services, Bluhm emphasized that an evaluation of Plaintiff's
13  physical abilities, functional limitations, and "mental
14  activities" "was not the focus of either of [Plaintiff's] visits"
15  to the Redlands Clinic.  (AR 248.)  Bluhm noted, however, that
16  Plaintiff "was alert and had appropriate interaction during both
17  office visit[s] and was ambulatory."  (Id.)

18      On November 18, 2009, Plaintiff was seen in the emergency
19  room of Riverside County Regional Medical Center in Moreno Valley
20  for complaints of bilateral ear pain, sinus tenderness, and
21  toothache.  (AR 351.)  She was discharged with Tylenol and a

22

23

24      [26]  Cephalexin is an antibiotic used to treat pneumonia and
25  bone, ear, skin, and urinary-tract infections.  See Cephalexin,
    MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
26  meds/a682733.html (last updated Sept. 1, 2010).

27      [27]  "Bid" is an abbreviation of the Latin expression "bis
28  in die," meaning twice a day.  Stedman's Medical Dictionary,
    supra, at 201.

11

prescription for clindamycin.[28]  (AR 354.)  The physician's assessment is illegible.  (AR 352.)

On December 3, 2009, Plaintiff was seen at the RCRMC Family Care Clinic by a nurse practitioner, apparently to review and renew Plaintiff's medications.  (AR 350.)  The provider's notes reported rosacea "controlled" with twice-daily application of metronidazole cream; GERD treated with daily omeprazole; asthma treated with Xopenex[29] and twice-daily Flovent;[30] no wheezing; and pain in Plaintiff's lower back, right hip, and coccyx treated with ibuprofen.  (Id.)  No changes were made to Plaintiff's medications.  (Id.)  An x-ray of her lower spine was ordered, and Plaintiff was told to follow up in four to six weeks.  (Id.)

On December 7, 2009, imaging of Plaintiff's lumbar spine to evaluate her complaints of pain showed degenerative change[31]

---

[28]    Clindamycin is an antibiotic.  See Clindamycin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a682399.html (last updated Oct. 1, 2010).

[29]    Xopenex is a brand name for levalbuterol, an inhaled medication used to prevent or relieve wheezing, shortness of breath, coughing, and chest tightness.  See Levalbuterol, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a603025.html (last updated Sept. 1, 2010).

[30]    Flovent, like Flonase, is a brand name for fluticasone. (See n.22, supra.)  Flovent is inhaled orally to prevent difficulty breathing, chest tightness, wheezing, and coughing caused by asthma.  See Fluticasone Oral Inhalation, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601056.html (last updated Sept. 1, 2010).

[31]    Degenerative changes in the spine cause the loss of normal structure and function.  See Degenerative Back Conditions, Cleveland Clinic, http://my.clevelandclinic.org/orthopaedics-rheumatology/diseases-conditions/degenerative-back-conditions. aspx (last visited Dec. 11, 2013).  Such changes indicate degenerative disc disease, also called intervertebral disc

12

1  without fracture or subluxation.[32]  (AR 254, 256.)

2      On December 21, 2009, Plaintiff was seen in the RCRMC

3  emergency room for complaints of cough and congestion lasting

4  three days.  (AR 342.)  The physician explained to Plaintiff that

5  her ailment was "likely viral," but she requested antibiotics and

6  was given a prescription for amoxicillin.[33]  (AR 343, 347.)  The

7  physician's impression is recorded as "URI," likely, upper

8  respiratory infection.  (AR 343.)

9      On January 25, 2010, Plaintiff was seen at the RCRMC Family

10 Care Clinic for chronic back pain.  (AR 338.)  The physician's

11 notes appear to indicate that Plaintiff was instructed to use

12 Tylenol or Motrin with food and was referred to a physical

13 therapist.  (Id.)  The physician noted that if Plaintiff's pain

14 persisted, she would be given an MRI and referred to an

15 orthopedist.  (Id.)  She was instructed to follow up in two

16 months with her primary-care physician.

17     On February 3, 2010, Plaintiff was seen in the RCRMC

18 emergency room for a complaint of shortness of breath lasting

19

20 disease, "a common musculoskeletal condition that primarily
   affects the back."  Intervertebral disc disease, Office of Rare
21 Diseases Research (ORDR), http://rarediseases.info.nih.
   gov/gard/8572/intervertebral-disc-disease/resources/1 (last
22 updated Mar. 12, 2012).  "It is characterized by intervertebral
   disc herniation and/or sciatic pain (sciatica) and is a primary
23 cause of low back pain, affecting about 5% of individuals."  Id.;
   but see Degenerative Back Conditions, supra ("Nearly everyone
24 experiences some disc degeneration after age 40.").

25     [32]  Subluxation is an incomplete dislocation between joint
26 surfaces.  Stedman's Medical Dictionary, supra, at 1716.

27     [33]  Amoxicillin is an antibiotic.  See Amoxicillin,
   MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
28 meds/a685001.html (last updated Sept. 1, 2010).

three days.  (AR 328.)  The physician noted that Plaintiff's lungs were clear, her respiratory effort was normal, she had a dry cough, and she was not wheezing, but the physician diagnosed her with pneumonia.  (AR 329.)  Plaintiff was given a chest x-ray.  (AR 330.)  She was discharged with prescriptions for amoxicillin, albuterol, naproxen[34] for "pain/inflammation," and Phenergan[35] for her cough and an appointment at the Family Care Clinic.  (AR 329, 331, 334.)

On February 16, 2010, Plaintiff was seen in the RCRMC emergency room for a complaint of difficulty breathing.  (AR 319.)  Plaintiff reported that she had experienced two asthma attacks that day and "some PND," or paroxysmal nocturnal dyspnea.[36]  (Id.)  She had finished her amoxicillin prescription the prior day and requested a chest x-ray.  (Id.)  The physician assessed "[a]sthma exacerbation" and instructed Plaintiff to "keep clinic appt. Thurs."  (AR 320.)  She was discharged with a prescription for albuterol to be used every four hours.  (AR 326.)

On February 18, 2010, Plaintiff was seen at the Family Care

---

[34]   Naproxen is a nonsteroidal antiinflammatory drug, or NSAID, used to relieve pain, inflammation, fever, or stiffness. See Naproxen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last updated Oct. 30, 2013).

[35]   Phenergan is a brand name for promethazine, used to relieve the symptoms of allergic reactions.  See Promethazine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last updated Jan. 1, 2011).

[36]   Paroxysmal nocturnal dyspnea is shortness of breath "appearing suddenly at night, usually waking the patient from sleep."  Stedman's Medical Dictionary, supra, at 556.

14

Clinic.  (AR 317.)  Her breathing issues were noted to have "resolved"; she had no coughing, shortness of breath, "CP" (presumably, chest pain), or fever.  (Id.)

On March 3, 2010, Plaintiff was seen in the RCRMC emergency room for complaints of cough and congestion since January 2010. (AR 316.)  Plaintiff was assessed as having an upper respiratory infection, prescribed a Z-pak[37] for bronchitis, and advised to rest, take fluids, and continue all medications.  (AR 313.)

On April 19, 2010, Plaintiff was seen by nurse practitioner Janet Martinez at the Family Care Clinic for issues with asthma and chronic lower-back pain.  (AR 310.)  With respect to her asthma, she was advised to continue with Flovent and albuterol and to start Allegra-D[38] daily.  (AR 307, 310.)  She was referred for an MRI of her back and told to continue taking Advil for pain and return in two weeks for her MRI results.  (AR 310.)

On April 23, 2010, Plaintiff was seen in the RCRMC emergency room for complaints of cellulitis on both legs.  (AR 300.)  The physician found multiple superficial varicosities on both lower legs and a few areas of redness on Plaintiff's right leg but "no evidence of cellulitis." (AR 301.)  The notes further indicate that Plaintiff exhibited normal respiratory effort and

---

[37]   A "Z-pak" is a six-day course of Zithromax, a brand name for the antibiotic azythromycin.  See Azythromycin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697037.html (last updated Oct. 15, 2012).

[38]   Allegra-D is the brand name for a combination of fexofenadine and pseudoephedrine and is used to relieve seasonal allergy symptoms.  See Fexofenadine and Pseudoephedrine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601053.html (last updated Aug. 1, 2010).

orientation.  (AR 301.)   The physician recorded an impression of superficial thrombophlebitis[39] in both legs and directed Plaintiff to continue her current medications – listed as albuterol, Advil, Flovent, and Nexium[40] (AR 300) – and to follow up with the Family Care Clinic.  (AR 301.)   Plaintiff was provided instructions for home care of phlebitis, including heat, ibuprofen, frequent sitting and elevation of the legs, and use of support hose.  (AR 306.)

On May 17, 2010, an MRI of Plaintiff's lumbar spine showed disc dessication, "mild degenerative disc disease at the L4-L5," "moderate degenerative disc disease at L5-L6 and L6-S1," minimal to mild circumferential disc bulges, and neural foramen narrowing.[41]  (AR 292-93.)  On June 4, 2010, Plaintiff was seen at Riverside Family Clinic to review the results of that MRI.  (AR 298.)  The physician's notes indicate that she "refuses any pain

---

[39]     Thrombophlebitis is swelling of a vein caused by a blood clot.  See Thrombophlebitis, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002098/ (last updated May 6, 2011).

[40]     Nexium is a brand name for esomeprazole, used to treat GERD.  See Esomeprazole, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a699054.html (last updated Oct. 30, 2012).

[41]     Foramen or foramina are apertures or perforations through a bone or a membranous structure.  Stedman's Medical Dictionary, supra, at 698.  Narrowing of the spinal foramen, which house the nerves comprising the spinal cord, can place pressure on these nerves and cause pain, numbness, or weakness. See Spinal Stenosis, PubMed Health, http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0001477/ (last updated June 7, 2102); Herniated Disk, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001478/ (last updated Apr. 16, 2013).

16

1  meds" but include Flexeril[42] among Plaintiff's current
2  medications.  (AR 298-99.)

3      On June 28, 2010, Plaintiff was seen at the Family Care
4  Clinic for a pap smear and complaints of back pain.  (AR 295.)
5  Plaintiff's pain was reported to be at a level of five to six out
6  of 10 and to be located in her back and left shoulder.  (Id.)  An
7  entry under "Current (Home) Medications" for Flexeril "three
8  times daily as needed" was crossed out (AR 296), and although
9  Plaintiff received a renewed prescription for Nexium (AR 297),
10 there is no evidence that her back was examined or treatment
11 prescribed on this visit.

12     On December 28, 2010, Plaintiff was seen at the Family Care
13 Clinic for a complaint of right-hand tingling.  (AR 359.)  The
14 notes also reflect a report of shoulder pain rated at a level of
15 five out of 10.  (Id.)  Plaintiff complained of bilateral hand
16 numbness, more at night, and trouble gripping objects with her
17 hand.  (Id.)  Plaintiff was reported to have full range of
18 motion, no edema, and normal pulses in her extremities.  (Id.)
19 Dr. Luther Mangoba assessed Plaintiff's hand numbness as "likely
20 . . . carpal tunnel," "mild," and recommended a wrist splint and
21 ibuprofen.  (AR 357.)[43]

22

23     [42]  Flexeril is a brand name for cyclobenzaprine, a muscle
24 relaxant.  See Cyclobenzaprine, MedlinePlus, http://www.nlm.nih.
   gov/medlineplus/druginfo/meds/a682514.html (last updated Oct. 1,
25 2010).

26     [43]  In her Complaint and moving papers, Plaintiff
   references numerous medical records postdating the Appeals
27 Council's denial of review.  To the extent those records may
   relate to Plaintiff's medical condition before April 17, 2012,
28 they are not properly before the Court because Plaintiff has not

1

2

3

4

5

6

7

8

9

10

11

12

13

     B.   <u>Function Reports and Asthma Questionnaire</u>

On October 31, 2009, Plaintiff completed a Function Report. (AR 187-88.)  She stated that on a typical day "when I don't get called to substitute teach," she prepared meals, exercised, did laundry and other housework, read, watched television, worked on her novel on her computer, drove, did errands, visited the library to check email and do research, returned phone calls, paid bills, and did other paperwork.  (AR 176-77.)  Plaintiff was generally able to bathe and dress herself independently, relying on her sister for limited assistance when Plaintiff's back hurt. (AR 177.)  In addition to caring for herself independently, Plaintiff contributed to the care of her sister and grandchildren.  (<u>Id.</u>)

14

15

16

17

18

19

20

21

22

23

Plaintiff prepared three meals daily, including a "hot dinner" for lunch and brownies.  (AR 178.)  She estimated that meal preparation required about 30 minutes and explained that she sometimes sat while preparing food to accommodate her ailments. (<u>Id.</u>)  Although Plaintiff's back, asthma, and allergies prevented her from doing yardwork, she cooked, did laundry, and did "light cleaning" daily, relying on her sister to lift heavy objects or bend down to hold the dust pan.  (<u>Id.</u>)  Plaintiff stated that she did errands outside the home every day and spent 30 minutes or more shopping for groceries "several days a week."  (AR 179.)

24

25

26

27

28

shown that they are material or good cause for failing to introduce them earlier, <u>Key v. Heckler</u>, 754 F.2d 1545, 1551 (9th Cir. 1985) (good cause exists if claimant could not have obtained evidence at the time of the administrative proceeding), and thus the Court declines to discuss or consider them.  <u>See</u> Section IV.B.1, <u>infra</u>.

She was able to pay bills, handle a savings account, count change, and use a checkbook. (<u>Id.</u>)  Plaintiff stated that she was an "excellent reader and writer," doing both daily, and was a "fair" exerciser, requiring much rest between repetitions. (AR 180.)  She socialized with friends over the phone weekly and in person about every 10 days. (<u>Id.</u>)  Plaintiff needed accompaniment on her regular trips to the library, to drop her sister off at the gym, to her son's house, and to the market only when she did not feel well or needed help lifting items. (<u>Id.</u>)

Plaintiff indicated that her impairments affected lifting, squatting, bending, standing, walking, sitting, kneeling, concentration, and following instructions. (AR 181.)  She stated that she could not walk or stand "for sustained periods of time" because of her cellulitis (AR 177, 180) and that working at the computer "for long periods" had caused her back and tailbone to "go[] out on me and become very painful & rendered me bedridden" (AR 180).  She noted back problems dating to childhood (AR 183) and significant pain as early as her college days (AR 177).  She explained that she had "always had trouble with bending for any prolonged period of time" because it caused back pain, she was unable to kneel without pain, and sitting "for a prolonged period of time" hurt her back and tailbone. (AR 181.)  She had experienced a pinched nerve in her back the spring before her filing (AR 186) and treated it with a heating pad and Advil (AR 177).

Plaintiff said that exercise helped her back pain. (AR 183.)  She noted, however, that "[w]hen I hurt my back or it goes out, I cannot do my exercises" (AR 180) and that "when I hurt my

1 back typing at the computer for long periods of time, I was
2 unable to use my AB Lounger" (AR 186).  She also noted that
3 although the "exercise circuit" at the gym "worked for me," she
4 was unable to use "one machine that hurt my back," delaying her
5 return to the gym for a week the time she tried it (AR 185-86).
6 The only assistive devices Plaintiff used were reading glasses
7 and, when at amusement parks, festivals, or waiting in long
8 lines, a wheelchair "due to my cellulitis."  (AR 182.)

9     Plaintiff had been unable to maintain a job at a Michigan
10 hotel because it required constant standing and bending and
11 another at a candy store because it required bending and lifting
12 items from low shelves.  (AR 184.)  She left her part-time job at
13 the Guadalupe Home for Boys in 1993, seeking "room for
14 advancement," and joined the St. John's School for Boys as an
15 instructional aide.  (AR 185.)  She left that job because "things
16 didn't seem above board" and she did not wish to risk injury to
17 herself or her professional reputation.  (Id.)[44]

18     Plaintiff stated that "[m]y asthma is fairly well controlled
19 with my Flo-Vent steroid inhaler . . . which . . . keep[s] my
20 asthma under control."  (AR 187.)  She noted a history of
21 respiratory infections and challenges in keeping her airway
22 clear, however.  (Id.)  She also noted that she suffered from
23 GERD and sometimes could not afford the Prilosec she needed daily
24 to treat it.  (AR 188.)  Plaintiff stated that she had irritable-

25

26

27     [44]     At the hearing she testified that the last time she had
28 a full-time job was in the "mid '80s"; she left it to care for
her disabled son.  (AR 39.)

20

bowel syndrome ("IBS")[45] which could be triggered by coffee,
popcorn, other foods, and antibiotics and "can send me running to
the toilet, which interferes with my trying to substitute teach."
(Id.)

Plaintiff indicated trouble with concentration but stated
that "I can focus well for about an hour at a time" before
needing a break.  (AR 181.)  She finished what she started "for
the most part" but needed to take breaks when she became
fatigued.  (Id.)  Following written instructions was "one of my
weak areas, going on back to childhood," and Plaintiff struggled
with spoken instructions involving more than two steps unless she
wrote them down.  (Id.)  She was a responsible student and
tenant, however, and handled stress "[f]airly well."  (AR 182.)
She did not like changes in routine but could handle them "if
someone is patient with willing to teach me the new way of doing
things."  (Id.)

On November 2, 2009, Plaintiff's sister Nancy J. Block
completed a Function Report on Plaintiff's behalf.  (AR 168-75.)
Block indicated that Plaintiff's daily activities included
bathing herself, preparing meals, doing housework and errands,
visiting the library and the market, paying bills, watching
television, and reading.  (AR 168, 170.)  Plaintiff drove her
sister to complete her errands and visit the gym and cared for

[45]   IBS is a disorder that leads to abdominal pain and
cramping, changes in bowel movements, and other symptoms.
Irritable bowel syndrome, PubMed Health, http://www.ncbi.nlm.
nih.gov/pubmedhealth/PMH0001292/ (last updated July 22, 2011).
It is distinct from inflammatory bowel disease ("IBD"), which
includes Crohn's disease and ulcerative colitis, both of which
involve abnormal bowel structure.  (Id.)

1  "Baby April" – apparently her granddaughter (<u>see</u> AR 177) – with

2  Block's assistance (AR 169).

3      Block stated that her sister's disabilities affected

4  lifting, squatting, bending, standing, walking, sitting,

5  kneeling, and following instructions.  (AR 173.)  Plaintiff used

6  to be able to stand longer and drive greater distances and could

7  no longer bend over for very long but needed help only when her

8  back or knees went out.  (AR 169.)  Plaintiff sometimes needed to

9  sit to prepare meals and needed her sister's help with activities

10 that required lifting heavy items or bending over.  (AR 170.)

11 Plaintiff used a wheelchair for family trips to amusement parks

12 and festivals "because of her cellulitis & bad back & knees."

13 (AR 174.)

14     Nonetheless, Plaintiff went to the market two or three times

15 a week and visited her son's house and the library almost every

16 day.  (AR 171-72.)  She was able to pay bills, take care of her

17 personal needs, take her medicines with no reminders, and finish

18 what she started but sometimes had to check and recheck

19 directions or write them down.  (AR 170-71, 173.)  She exercised

20 when her back was not bothering her, spoke on the phone to

21 friends about twice a week, and visited friends and her

22 grandchildren each about twice a month.  (AR 172.)

23     On November 6, 2009, Plaintiff completed an Adult Asthma

24 Questionnaire.  (AR 189-90.)  She stated that the frequency of

25 her asthma attacks varied, at worst occurring "once a month or

26 more," and that she was able to remedy attacks with "two or more

27 puffs" from an albuterol inhaler.  (AR 189.)  She also used a

28 Flovent inhaler twice daily.  (AR 190.)  Plaintiff had not

1    required emergency care or hospitalization for asthma treatment.

2    (Id.)  She had been seen most recently for asthma on June 10 and

3    October 6, 2009, to obtain Flovent refills.  (AR 189.)

4         C.   Assessments of State Medical Consultants

5              1.   Dr. Eriks

6         On December 28, 2009, internist Dr. Sandra Eriks of the Alto

7    Medical Group in San Bernardino reported the results of her

8    internal-medicine evaluation of Plaintiff, performed at the

9    request of the Department of Social Services.  (AR 258-62.)  Dr.

10   Eriks noted that her report was based on information provided by

11   Plaintiff, "who is considered a marginal historian," and on her

12   medical records.  (AR 258.)

13        Plaintiff reported that she lived with her mentally disabled

14   sister, cared for three young grandchildren and did all the

15   cooking, cleaning, shopping, laundry, and driving.  (Id.)  She

16   stated that "[s]he also works part time as a substitute teacher."

17   (Id.)  She listed her current medications as Flovent, albuterol,

18   Nexium, Noritate cream, triamcinolone cream, iron tablets, and

19   Astelin spray.  (AR 259.)

20        Plaintiff stated that although she had suffered from asthma

21   for 10 years, her "breathing has been stable for many years" and

22   she did not suffer from dyspnea[46] with exertion or wake with

23   shortness of breath.  (Id.)  Plaintiff reported that she had

24   suffered low-back pain "most of her life" and that the pain

25   worsened in April 2009, "when her back went out and she pinched a

26

27        [46]    Dyspnea is a subjective difficulty or distress in
     breathing that normally occurs during exertion or at altitude.
28   Stedman's Medical Dictionary, supra, at 556.

1   nerve." (AR 258.) She reported that the pain sometimes radiated

2   into her right hip or shoulder blades, was worsened by standing

3   or bending over, and was improved by massage, chiropractic care,

4   and bed rest. (Id.) Plaintiff reported intermittent pain in

5   both knees but denied morning stiffness and demonstrated full

6   range of motion, stability, and no tenderness or crepitation[47] in

7   her knees. (AR 258, 260-61.)

8       Dr. Eriks reported that her findings upon physical

9   examination were based upon formal testing as well as the

10  doctor's observations. (AR 259.) Plaintiff's blood pressure was

11  122/80, her pulse was 78 beats per minute, her weight was 212

12  pounds, and her height was 63 and a half inches. (Id.)

13  Plaintiff's right grip strength was recorded as 45/60/45 and her

14  left as 45/50/35, but the medical assistant noted marginal

15  effort. (Id.)

16      Dr. Eriks found Plaintiff to be "well developed, well

17  nourished," and with good hygiene. (AR 260.) She noted no

18  abnormalities upon examination of Plaintiff's head, eyes, nose,

19  mouth, throat, ears, neck, and chest. (Id.) Plaintiff's lungs

20  demonstrated "[g]ood air movement, normal symmetric breath

21  sounds," "[n]o rales or rhonchi,"[48] and an "[e]xpiratory phase"

22

23      [47]  Crepitation is noise or vibration produced by the
24  rubbing of bone or "irregular degenerated cartilage surfaces"
    together and can indicate osteoarthritis or other conditions.
25  Stedman's Medical Dictionary, supra, at 424.

26      [48]  Rales and rhonchi are sounds detected on auscultation
    of breath sounds. See Stedman's Medical Dictionary, supra, at
27  1507. Rales is a nonspecific term that can refer to either
    rhonchi or crepitations (see n.47, supra). See Stedman's Medical
28  Dictionary, supra. A rhonchus is a sound with a musical pitch

                                   24

"within normal limits." (<u>Id.</u>) Plaintiff's chest "reveals normal anterior/posterior diameter, normal air movement with normal expiratory phase and no wheezing." (AR 261.) Dr. Eriks noted that Plaintiff had not been hospitalized or treated at an emergency facility for asthma in the past year. (<u>Id.</u>)

Plaintiff's pulse was normal. (<u>Id.</u>) Examination of her heart and abdomen revealed no abnormalities. (<u>Id.</u>) Dr. Eriks's examination of Plaintiff's back revealed "no paraspinous muscular tenderness or spasm," "back motion within normal limits," and "good strength, adequate sensation and no reflex abnormalities." (<u>Id.</u>) Plaintiff demonstrated full range of motion in her shoulders, hips, knees, ankles, and feet. (AR 260-61.) Dr. Eriks noted Plaintiff's complaint of "rather diffuse body pain" but reported no abnormalities to explain such discomfort. (AR 261.)

Dr. Eriks noted Plaintiff's history of cellulitis and reported that on the day of examination, Plaintiff had "good circulation," "multiple small varicosities in both lower extremities," and "no evidence of active infection." (AR 260.) Dr. Eriks noted that there was no "tenderness, warmth or erythema of any joints" and no "clubbing, cyanosis or edema." (<u>Id.</u>)

Noting that her examination of Plaintiff was limited to an assessment of alleged disability, Dr. Eriks opined that "claimant has no restrictions in the areas of lifting, carrying, standing, walking, or sitting," "[n]o special limitations in standing,

caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus.   <u>Id.</u> at 1568.

1  walking or sitting," and "[n]o postural, manipulative, visual,

2  communicative or environmental limitations."  (AR 262.)

3          2.   Dr. Andia

4       The same day, Plaintiff was seen by Dr. Ana Maria Andia of

5  Alto Medical Group for a comprehensive psychiatric evaluation.

6  (AR 265.)  Dr. Andia's assessment was based on information

7  provided by Plaintiff, whom she found to be "a reasonable

8  historian," as the medical records available for the doctor's

9  review reflected no psychiatric analysis or treatment.  (Id.)

10  Plaintiff confirmed that she had never been hospitalized for or

11  received outpatient psychiatric treatment.  (AR 266.)

12      Plaintiff reported that she was "currently employed as a

13  substitute teacher," remained on call, and last worked on

14  December 9, 2009.  (AR 267.)  She stated that she got along well

15  with coworkers.  (Id.)  Plaintiff reported that she managed her

16  own personal care and was able to drive.  (Id.)  She described

17  "[o]utside activities" as taking her grandchildren to the park,

18  exercising on an elliptical machine, and occasional trips to the

19  beach.  (Id.)  Her hobbies included reading, writing, and

20  watching educational programs on TV.  (Id.)  She was able to pay

21  bills, handle cash, and go out alone.  (Id.)  She reported good

22  relationships with family and friends.  (Id.)  She said she

23  occasionally had difficulty focusing her attention but had no

24  difficulty completing household tasks or making decisions.  (Id.)

25      Dr. Andia's notations of Plaintiff's daily activities appear

26  to be taken from Plaintiff's own statements in her Function

27  Report.  (Compare AR 268 with AR 176.)  Dr. Andia found Plaintiff

28  to be "neatly and casually groomed," capable of "good eye contact

and good interpersonal contact," "generally cooperative," "able to volunteer information spontaneously," and apparently "genuine and truthful." (AR 268.) Dr. Andia noted that Plaintiff did not appear to be under the influence of drugs or alcohol. (Id.)

Plaintiff complained of lifelong difficulties with forgetfulness, directions, and concentration, problems she described as mild and of daily occurrence. (AR 266.) Plaintiff stated that "her ability to work has not been affected by these symptoms" and that "[h]er symptoms do not limit her daily activities." (Id.) Plaintiff reported that she believed she might have ADD "because it runs in her family" but had never been treated for the condition. (AR 270.) Although Dr. Andia's diagnostic impression noted "[a]ttention deficit disorder by history" (id.), her mental-status examination of Plaintiff revealed normal functionality (see AR 268-70), and she opined that "the claimant has no [psychiatric] condition that needs treatment at this time" (id.).

### 3. Dr. Brooks

On January 12, 2010, medical consultant Dr. R.E. Brooks, a psychiatrist, completed a Psychiatric Review Technique, indicating a finding of no medically determinable impairment. (AR 273, 283.) Dr. Brooks explained that although ADHD ran in Plaintiff's family, she had never been diagnosed with the disorder, and no Axis I or Axis II diagnosis had been established.[49] (AR 283.)

---

[49] The DSM-IV classifies mental disorders into axes. See Ramesh Shivani, R. Jeffrey Goldsmith & Robert M. Anthenelli, Alcoholism and Psychiatric Disorders, Nat'l Inst. on Alcohol

4.  Dr. Scott

The same day, Dr. C. Scott, a gynecologist, prepared a Case Analysis.  (AR 284-86.)  Dr. Scott reviewed records from Beaver Medical Group, Redlands Family Clinic, Ramesh Bansal,[50] Redlands Community Hospital, Verde Valley Medical Center, and Alto Medical Group.  (AR 284.)  Dr. Scott summarized as "significant objective findings" the reports from Redlands Family Clinic and Alto Medical Group (AR 284-85) and found that Plaintiff had no restrictions on standing, walking, or sitting and no postural, manipulative, visual, communicative, or environmental limitations (AR 285).  Dr. Scott recommended that Plaintiff's physical and mental complaints be deemed nonsevere.  (Id.)

5.  Dr. Balson

On March 20, 2010, P.M. Balson, a psychiatrist, approved a psychiatric Case Analysis that reconsidered Plaintiff's claim of possible ADD or ADHD and affirmed Dr. Brooks's January 12, 2010 finding that Plaintiff had no medically determinable impairment. (AR 287-88.)

6.  Dr. Schwartz

On March 22, 2010, Dr. L. Schwartz, an internist, approved a Case Analysis that reviewed and affirmed Dr. Scott's January 12, 2010 finding that Plaintiff's impairments were not severe.  (AR

---

Abuse and Alcoholism (Nov. 2002), http://pubs.niaaa.nih.gov/ publications/arh26-2/90-98.htm.  Axis II disorders are personality disorders; other mental disorders fall into Axis I. Id.  Dr. Brooks presumably references Dr. Andia's report, which includes an axis-based assessment (AR 270), as there are no other psychiatric assessments in the record (see AR 265).

[50]  It is unclear which record Dr. Scott meant "Ramesh Bansal" to indicate.

28

289.)

D.   <u>Hearing Testimony</u>

At the January 20, 2010 hearing before the ALJ, Plaintiff testified that she had a bachelor's degree in English and creative writing and an emergency teaching permit.[51]   (AR 43.) She last worked as a substitute teacher for two half days in April or June of 2010, "and then when I did a full day I started having problems with my legs, circulation again and my back hurt me so."  (AR 39.)   She testified that she stopped substitute teaching because of "problems with my back and my legs" but also because "they started cutting back hours because of the teacher cutbacks."  (AR 41.)   She was still "on the books" as a substitute teacher but claimed she then had no phone at which she could be contacted were work available.  (AR 42.)   Plaintiff testified that her most recent full-time job was in the mid-1980s, a position she left because "[m]y son had disabilities." (AR 39; <u>but see</u> AR 185 (describing full-time position in 1993).) When asked whether she was receiving any financial assistance, Plaintiff stated that she was "living with my sister who receives my father's earned Social Security and Medicare and I help her." (AR 43.)   Plaintiff explained that her sister "can't drive and she lives with me in my little travel trailer."  (<u>Id.</u>)

Plaintiff testified that she could not work as a substitute

---

[51]     An emergency teaching permit "authorize[s] the holder to serve as [a] day-to-day substitute teacher[] in any classroom, including preschool, kindergarten, and grades 1-12."  <u>See</u> <u>Substitute Teaching</u>, Commission on Teacher Credentialing, http://www.ctc.ca.gov/credentials/creds/substitute.html (last updated Nov. 26, 2007).

29

teacher or in any other position because of problems with her
feet and IBS.  (AR 44-45.)  She explained that because of "very
poor circulation" and "bouts at times with cellulitis," she
needed to rest and elevate her feet hourly and that her IBS
required unpredictable trips to the bathroom.  (AR 45.)
Plaintiff's problems with her feet affected both legs when she
had been standing for too long, which Plaintiff clarified meant
four to five hours, or when she drove a long distance, such as on
a trip of six hours.  (AR 46.)  She testified that in August
2006, she was hospitalized for four days for treatment of
cellulitis following a cross-country road trip (id.), although
the record contains no evidence to support this.  At the time of
the hearing, Plaintiff testified that she wore compression
stockings to prevent cellulitis and that "I haven't had it in a
while."  (AR 47.)

     Plaintiff stated that she continued to suffer from pain and
problems with circulation and treated those issues by elevating
her feet "on and off through the day" for 30 minutes to an hour.
(AR 47-48.)  She clarified that she had to elevate her feet only
when having problems with them.  (AR 48.)  She rarely had
problems "if I don't stand all day," but "[i]f I'm standing and
[substitute teaching] then I've got to elevate."  (Id.)

     Plaintiff testified that she also suffered pain in her back
and tailbone.  (AR 50.)  She described significant pain following
car trips of five to six hours.  (Id.)  More generally, Plaintiff
testified that her back and tailbone issues required that she
shift position when sitting "every so often . . . depend[ing on]
how comfortable the chair is."  (Id.)  She estimated that she

could sit for about an hour before needing to get up and walk around "[b]ecause my back gets stiff and sometimes there's pain," including in her tailbone.  (AR 51.)  She estimated that she could stand for 30 minutes to an hour without pain and could walk for about 30 minutes.  (AR 51-52.)  She alleviated back pain from standing or sitting by reclining in bed or on a lounge chair. (AR 52.)

Plaintiff testified that she had injured both knees in falls "years ago" and that the injuries limited her ability to do certain exercises, such as lunges and squats.  (AR 53-54.) Plaintiff stated that she also suffered from carpal tunnel syndrome in her right hand (AR 43, 50), which caused numbness that interfered with her writing, limited her ability to reach overhead, and occasionally caused her to drop things (AR 49-50).

Plaintiff stated that she accommodated her back limitations at home by, for instance, preparing meals while seated or while standing and leaning into the counter slightly.  (AR 52.)  She also sought assistance with tasks that required her to bend over. (AR 53.)  She generally did not need help with personal care and had developed ways to dress and bathe herself to accommodate limitations caused by her back pain.  (AR 54.)  Her sister helped if she had trouble.  (Id.)

**VI.  DISCUSSION**

Plaintiff alleges that the ALJ erred in failing to properly assess Plaintiff's subjective complaints and the relevant medical evidence of record.  (Pl.'s Mot. at 2-3.)  Remand is not warranted.

31

A.   The ALJ Did Not Err in Assessing Plaintiff's
     Credibility

Plaintiff argues that the ALJ improperly evaluated her subjective complaints of pain in her back, tailbone, and joints. (Pl.'s Mot. at 5.)  Specifically, Plaintiff contends that her allegations of pain are supported by the x-rays and MRI of her back; medical records in which she was seen for complaints of back pain and prescribed medication for pain relief; her alleged scoliosis, history of pinched nerves, and falls on her knees; and alleged diagnoses of arthritis and fibromyalgia and prescription of a cane.  (Pl.'s Mot. at 5-7.)  Remand is not warranted.

1.   Applicable law

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's

32

testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  <u>See Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.[52]  <u>Lester</u>, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th Cir. 2002).

    2.   <u>Discussion</u>

As the ALJ noted, his assessment of Plaintiff's subjective complaints was largely consistent with her own statements.  (AR 29.)  Although Plaintiff asserts that the record supports her claims of "severe" pain in her back and tailbone and "greatly" limited daily activities on account of her degenerative disc disease[53] (Pl.'s Mot. at 5-6), her own submissions and testimony

---

[52]   Dr. Eriks's report that Plaintiff demonstrated "marginal effort" on a grip test (AR 259) may be evidence of malingering that would relieve the ALJ of the burden of providing clear and convincing reasons for discounting Plaintiff's credibility.  <u>Lester</u>, 81 F.3d at 834; <u>Bagoyan Sulakhyan v. Astrue</u>, 456 F. App'x 679, 682 (9th Cir. 2011).  Nevertheless, as discussed herein, the ALJ provided clear and convincing reasons for not crediting Plaintiff's subjective symptom testimony.

[53]   Plaintiff's critique includes assertions of significant pain and physical limitations attributable to alleged arthritis and fibromyalgia.  (Pl.'s Mot. at 6-7.)  She provided no evidence

belie her claims of disabling pain.  The ALJ noted that although Plaintiff had not engaged in substantial gainful activity since the alleged disability date (AR 27), she remained on the active call list for substitute teachers (AR 29; see AR 42, 176, 258). Plaintiff stated that she not only was able to care for her own needs but contributed to the care of her sister and three young grandchildren.  (AR 177, 258.)  The typical day Plaintiff described in her Function Report reflected significant activity, including preparing multiple meals, doing housework, exercising, driving, completing such errands outside the home as shopping for groceries a few times a week, reading, using a computer, researching and writing a novel, returning phone calls, and addressing bills and other paperwork.  (AR 179, 187; see also AR 179 ("I go outside everyday and do my errands."), 178 ("I wash and dry laundry daily, as well as cook.  I do light cleaning daily." (emphasis in original)), 258 (Plaintiff "does all of the cooking, cleaning, shopping, laundry, and driving").)  Plaintiff stated that she rarely required assistance with these tasks.  (AR 54, 178, 180.)  Although Plaintiff argues in her response to Respondent's cross-motion for judgment on the pleadings that she in fact does these things irregularly (Pl.'s Resp. at 21-22), her submissions and testimony before the ALJ and Appeals Council

---

of these ailments in her submissions and testimony below.  As discussed further in Section VI.B.1, infra, the alleged diagnoses she describes in her moving papers postdate the decisions of the ALJ and Appeals Council and do not merit remand.  See 42 U.S.C. § 405(g) (requiring showing of good cause and materiality before new evidence may be considered).

1  indicated otherwise.

2      A specific finding that a claimant spends a substantial part
3  of her day engaged in pursuits involving the performance of
4  physical functions transferable to the work setting may be
5  sufficient to discredit her allegations.  Morgan v. Comm'r of
6  Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas,
7  278 F.3d at 959.  Here, the record supported the ALJ's express
8  finding that Plaintiff's daily activities, and her own statements
9  concerning those activities, were inconsistent with allegations
10 of constant, completely disabling pain.  Performance of routine
11 household tasks (cleaning, cooking, laundry, billpaying,
12 childcare) and personal care; driving, shopping, and performing
13 other errands outside the house; and performing research at the
14 library are activities that involve functions or skills that may
15 be transferred to the workplace.  See Morgan, 169 F.3d at 600
16 (ability to fix meals, do laundry, work in yard, and occasionally
17 care for friend's child were evidence of ability to work because
18 they reflected participation for substantial part of day in
19 pursuits involving performance of physical functions transferable
20 to work setting).  That Plaintiff has adapted her performance of
21 these activities to accommodate her alleged ailments does not
22 undermine the ALJ's finding that her daily activities were
23 inconsistent with her alleged severe disabilities.  See Molina,
24 674 F.3d at 1113 ("Even where those activities suggest some
25 difficulty functioning, they may be grounds for discrediting the
26 claimant's testimony to the extent that they contradict claims of
27 a totally debilitating impairment."); Osenbrock v. Apfel, 240
28 F.3d 1157, 1166-67 (9th Cir. 2001) (noting that ALJ properly

1  found claimant's self-imposed limits on daily activities did not

2  support alleged claims of disability).

3       Indeed, Plaintiff's descriptions of her back pain and

4  resultant limitations themselves suggest the pain was not so

5  great as to significantly limit her activities.  She alleged that

6  her back pain restricted her sitting but explained that she

7  merely needed to shift position "[e]very so often . . .

8  depend[ing on] how comfortable the chair is" and to get up and

9  move around after about an hour because of stiffness and

10 "sometimes" "pain."  (AR 50-51.)  She described significant

11 sitting-related back pain only following car trips of five to six

12 hours.  (AR 46.)  Moreover, among the types of limitations

13 detailed by Plaintiff were accommodations to her physical-fitness

14 activities necessitated by her alleged disabilities.  (See, e.g.,

15 AR 180 ("When I hurt my back or it goes out, I cannot do my

16 exercises."), 186 ("[W]hen I hurt my back typing at the computer

17 for long periods of time, I was unable to use my AB Lounger."),

18 183 ("exercise helps a little" with back issues), 185-86

19 (Plaintiff able to complete "exercise circuit" at gym "except one

20 machine that hurt my back," delaying her return to gym for a

21 week), 53-54 (knee injuries limited her ability to do certain

22 exercises, such as lunges and squats).)  These descriptions,

23 along with Plaintiff's description of her daily activities,

24 undermine Plaintiff's allegation that because of back issues she

25 had to limit standing to 30 minutes to an hour and walking to

26 about 30 minutes.  (AR 50-52.)  Nor are these alleged limitations

27 consistent with Plaintiff's other submissions and statements.

28 (See AR 179 (Plaintiff regularly spends "30 minutes or more"

shopping at supermarket), 46 (Plaintiff "could have problems" after a six-hour drive), id. (in discussion of cellulitis, "standing too long" meant four to five hours).)

Moreover, Plaintiff was able to accommodate these limitations in completing tasks at home.  (AR 52, 54.)  She generally was able to alleviate any back pain through conservative self-treatment, such as reclining, massage, chiropractic care, and bed rest.  (AR 52, 258.)  See Parra, 481 F.3d at 751 (noting that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment").

The ALJ also provided a clear and convincing reason for rejecting Plaintiff's subjective symptom testimony in that it was inconsistent with the medical evidence.  (AR 30-31.)  See Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same).  Although Plaintiff testified that she must limit her standing to one hour and her walking to 30 minutes on account of her back pain, none of the medical evidence reflects any such limitations.  Dr. Eriks's physical examination of Plaintiff

revealed "no paraspinous muscle tenderness or spasm," back motion "within normal limits without evidence of radiculopathy," "good strength, adequate sensation and no reflex abnormalities" (AR 261), leading her to opine that Plaintiff had no physical limitations attributable to her alleged impairments (AR 262). The record contained no medical evidence of Plaintiff's alleged scoliosis, pinched nerves, knee injuries, arthritis, fibromyalgia, or prescription of a cane.  (See Pl.'s Mot. at 5-6.)

Moreover, as the ALJ noted (AR 31), although medical records reflected Plaintiff's complaints of back pain, her treatment was conservative, consisting of two orders for imaging, one referral for physical therapy, and recommendations of medication for pain (AR 310, 338, 350, 357).  See 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (ALJ may consider effectiveness of medication and treatment in evaluating severity and limiting effects of impairment); Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").  Imaging of Plaintiff's spine demonstrated "mild" to "moderate" degenerative disc disease.  (AR 292-93; see also AR 254, 256.) But even the physician who reviewed Plaintiff's MRI results recommended that she treat her back pain primarily with medication.  (AR 298; see also AR 338 (recommendation of over-the-counter pain medication, referral for physical therapy, instruction to follow up with primary-care physician), 310

1   (referral for MRI, recommendation to treat pain with Advil).)[54]

2        Thus the ALJ properly found that although Plaintiff's
3   ailments could reasonably be expected to produce the symptoms she
4   alleged, her daily activity level, medical records, and
5   conservative treatment were inconsistent with her complaints of
6   severe and disabling pain.  (AR 30-31.)  Because the ALJ's
7   credibility finding is supported by substantial evidence, the
8   Court "may not engage in second-guessing."  Thomas, 278 F.3d at
9   959.  Plaintiff is not entitled to reversal on this basis.

10        B.   The ALJ Properly Evaluated the Medical Evidence

11        Plaintiff proffers evidence not before the ALJ or Appeals
12  Council and contends that the ALJ erred in relying heavily on Dr.
13  Eriks's opinion, discounting Plaintiff's sister's Function
14  Report, failing to deem severe Plaintiff's degenerative disc
15  disease and cellulitis, and failing to thoroughly examine her
16  medical records and properly consider the combined effect of her
17  impairments upon her ability to work.  (Pl.'s Mot. at 3.)  Remand
18  is not warranted.

19  _____

20       [54]   Plaintiff explains at length why she elected to take
    only ibuprofen and not the stronger Flexeril that had been
21  prescribed.  (Pl.'s Resp. at 13, 19.)  It does not appear that
    she ever proffered these explanations to the ALJ or Appeals
22  Council, and thus they are not properly before this Court on
    review.  See Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985)
23  (role of reviewing court is to determine whether substantial
    evidence in the record supports decision to deny benefits).  In
24  any event, Flexeril is a muscle relaxant, not a narcotic pain
    medication, so her explanation that she was afraid of becoming
25  dependent on it is not credible.  She also claims not to have
    been able to take it because it was so strong that she could not
26  then safely drive home from the doctor, but she does not explain
    why she could not simply have waited to take the Flexeril, which
27  is prescribed in pill form (see Cyclobenzaprine, supra, n.42),
    once she arrived home.
28

1.   <u>Plaintiff's new evidence does not warrant remand</u>

In her Complaint, Motion, and Response to Defendant's Cross-Motion, Plaintiff alleges several medical visits and diagnoses for which no evidence exists in the record, including diagnoses not raised before the ALJ or the Appeals Council.  (<u>See, e.g.</u>, Pl.'s Mot. at 6 (alleging 2012 diagnosis of arthritis in various joints); <u>id.</u> at 7 (alleging Sept. 28, 2012 diagnosis of fibromyalgia); <u>id.</u> (describing physical therapy in early 2012 during which "my therapist prescribed a cane").)  Plaintiff attached to her Complaint a record of her June 12, 2012 visit to Dr. Gina Tavassoli at the Family Care Clinic and a Physical Residual Functional Capacity Questionnaire completed by Dr. Tavassoli on May 18, 2011 (Compl. Ex. 1), neither of which was before the ALJ or the Appeals Council.  Plaintiff contends that her delay in submitting the latter document arose from Dr. Tavassoli's departure from the clinic and the leave of absence of the doctor who saw Plaintiff at the clinic following Dr. Tavassoli's departure.  (Compl. at 5.)  Although Plaintiff was represented by counsel when Dr. Tavassoli filled out the Questionnaire,[55] Plaintiff never submitted it to the Appeals Council, which was still considering her appeal.  (<u>See</u> AR 5-7, 213-16.)

To the extent Plaintiff seeks consideration of the documents attached to her Complaint, her motion is denied.[56]  Sentence six

_____

[55]   She now represents herself.

[56]   Plaintiff does not appear to seek remand on the basis of medical visits and alleged diagnoses for which she has provided descriptions but no records.  For this reason, the Court

of 42 U.S.C. § 405(g) provides that new evidence warrants remand only if it is material and there exists good cause for its late submission.  New evidence is material if it "bear[s] directly and substantially on the matter in dispute" and if there is a "reasonable possibility that the new evidence would have changed the outcome of the . . . determination." Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984) (internal quotation marks and emphasis omitted).  In order to be material, the proffered evidence must relate to the relevant time period. See Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001) (finding new evidence not material when it pertained to disability claimant did not have at time of administrative proceedings).  "Good cause" exists if new information surfaces after the Commissioner's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding.  Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985). A claimant does not meet the good-cause requirement by merely obtaining a more favorable medical report once her claim has been denied; she must demonstrate that the new evidence was unavailable earlier.  Mayes, 276 F.3d at 463.

The June 12, 2012 record attached to Plaintiff's Complaint appears to reflect an appointment to follow up on Plaintiff's response to treatment for cellulitis. (Compl. Ex. 1 at 1 ("6 week f/u"), 2 (assessment reflects "[c]ellulitis" "resolved" and additionally assesses "chronic" "[d]iarrhea").)  Although germane

_____

does not consider her allegations that she was not able to have a colonoscopy performed or see a rheumatologist earlier because of insurance issues.  (Pl.'s Mot. at 7; Compl. at 7.)

1  to Plaintiff's allegations, the document, which evidences only

2  conservative treatment and indicates that Plaintiff's pain was

3  "0" on a scale of 0 to 10 (id. at 2), could not reasonably have

4  affected the outcome of the case.  Cf. Parra, 481 F.3d at 751;

5  Warre, 439 F.3d at 1006.  The ALJ noted that the record reflected

6  no "recent episodes" of cellulitis (AR 29),[57] and treatment of her

7  earlier lower-leg ailments had been conservative (see AR 239

8  (cellulitis treated with antibiotics), 241 (cellulitis or

9  possibly phlebitis treated with antibiotics), 218 ("early"

10 cellulitis treated with antibiotics and Plaintiff instructed to

11 elevate legs and avoid long car trips), 249 (cellulitis treated

12 with antibiotics and compression stockings and Plaintiff

13 instructed to elevate legs twice daily), 301 (thrombophlebitis to

14 be managed with heat, ibuprofen, frequent sitting, elevation of

15 legs, and support hose)).  Plaintiff herself confirmed that

16 "[i]t's been a while" since she had problems with cellulitis,

17 implying that her compression stockings had solved the problem.

18 (AR 47.)  That Plaintiff appears to have been treated once for

19 cellulitis in the 16 months after the ALJ's decision would not

20 have altered his finding that Plaintiff did not have a severe

21 medically determinable impairment of cellulitis, particularly

22 when the record indicated that the cellulitis was "resolved."

23 Similarly, the record was devoid of any medical evidence of IBS,

24 as the ALJ noted (AR 23); a single doctor's notation of "chronic"

25

26 _____
   [57]   Although the ALJ stated that the last episode of
27 cellulitis occurred in early 2008 (AR 31), the record reflects at
   least suspicion of cellulitis in October 2009 (AR 249), the sole
28 notation of cellulitis in the record that postdates Plaintiff's
   application for benefits.

1  "[d]iarrhea secondary to food allergy" (Compl. Ex. 1 at 2) does
2  not constitute a diagnosis of IBS.  The June 12, 2012 record is
3  therefore not material, and remand is not warranted.  See Booz,
4  734 F.2d at 1380.

5      Similarly, the Questionnaire, which on the surface appears
6  to bear directly upon Plaintiff's alleged back pain and purports
7  to identify limitations akin to those Plaintiff alleges, could
8  not reasonably have affected the outcome of the case and is thus
9  not material.  See id.  Although Plaintiff describes Dr.
10 Tavassoli as "my physician" (Compl. at 8), Dr. Tavassoli failed
11 to complete the portion of the Questionnaire regarding
12 "[f]requency and length of contact" (Compl. Ex. 1 at 4), and the
13 record reflects no prior treatment by her.  More importantly, Dr.
14 Tavassoli does not appear to have examined Plaintiff before
15 completing the Questionnaire.  The doctor indicated neither a
16 diagnosis nor a prognosis, instead simply noting Plaintiff's
17 complaint of "chronic low back pain" and indicating that there
18 were no "clinical findings and objective signs" of Plaintiff's
19 claimed ailment.  (Id.)  It is therefore not surprising that the
20 responses on the Questionnaire reflect Plaintiff's claims of back
21 pain and limitations (compare Compl. Ex. 1 at 6 (Plaintiff
22 experiences pain "when she stands or sits longer than an hour")
23 with AR 51-52 (Plaintiff's testimony that she cannot sit or stand
24 for more than an hour)) and are inconsistent with the medical
25 evidence, the opinion of Dr. Eriks, and the opinions of the
26 medical consultants.  An ALJ is free to disregard a medical
27 opinion based solely on a claimant's properly discredited
28 subjective complaints.  See Tonapetyan v. Halter, 242 F.3d 1144,

1149 (9th Cir. 2001) (ALJ "free to disregard" doctor's opinion
that was premised on plaintiff's subjective complaints); see also
Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (same);
cf. Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005)
(treating physician's letter did not establish an impairment when
it merely restated patient's symptoms and contained no reference
to results from medically acceptable clinical diagnostic
techniques (citing SSR 96-4p, 1996 WL 374187, at *1 n.2 (July 2,
1996))). Moreover, the Questionnaire is internally inconsistent
(compare Compl. Ex. 1 at 5 (stating that Plaintiff cannot sit or
stand for even a minute without needing to get up) with id.
(noting that her pain and symptoms may interfere with her ability
to concentrate if "she stands or sits longer than an hour")), and
for that reason, too, would likely have been rejected by the ALJ.
See Tommasetti, 533 F.3d at 1041 (treating physician's opinion
may be rejected on the basis of incongruity between the doctor's
assessment and his own medical records). The Questionnaire would
not have altered the outcome of this case and is therefore not
material. Booz, 734 F.2d at 1380.

Nor has Plaintiff shown good cause for her failure to timely
submit the Questionnaire to the Appeals Council. See Key, 754
F.2d at 1551; Mayes, 276 F.3d at 463. She fails to note when she
provided the form to the clinic, when it was returned to her, or
why another doctor could not have timely completed it,
particularly given that there is no indication in the record that
Dr. Tavassoli had ever treated her. Moreover, the form was
completed May 18, 2011, after the hearing before the ALJ (AR 36)
but nearly a year before the Appeals Council issued its decision

1   (AR 1).  Plaintiff was still represented by counsel at that time
2   and yet offers no explanation for why counsel did not submit it
3   to the Appeals Council.  (See AR 5-7, 213-16).  Thus, she has not
4   shown good cause for failing to submit the Questionnaire to the
5   Commissioner before her decision became final.

6       Plaintiff is not entitled to remand based on the documents
7   attached to her Complaint.

8                 2.   The ALJ reasonably relied on the opinion of Dr.
9                      Eriks

10      Plaintiff cites as error the ALJ's "heavy reliance on Sandra
11  Eriks, M.D., who ordered no laboratory testing or examined my
12  medical records." (Pl.'s Mot. at 2.)  This was not error.

13      The ALJ properly assigned "[g]reat weight" to Dr. Eriks's
14  opinion, noting that the doctor "examined, interviewed and
15  observed the claimant on December 28, 2009." (AR 32.)  Indeed,
16  Dr. Eriks's opinion was supported by independent clinical
17  findings and thus constituted substantial evidence upon which the
18  ALJ could properly rely.  (See AR 259 (noting physical
19  examination of Plaintiff including formal testing), 259-61
20  (recording results of examination)); see Tonapetyan, 242 F.3d at
21  1149 (opinion of physician who conducted independent evaluation
22  of claimant constitutes "substantial evidence").  As the ALJ
23  noted, Dr. Eriks's physical examination of Plaintiff "was within
24  normal limits in all areas" and she therefore "did not think that
25  claimant had any physical restrictions" (AR 32; see AR 259-62).

26      Plaintiff asserts that Dr. Eriks's opinion should be
27  disregarded because she did not review Plaintiff's medical
28  records or perform laboratory tests.  (Pl.'s Mot. at 2.)  In

1  fact, Dr. Eriks's report indicates that medical records were
2  available to her (AR 258), and there is no reason to believe she
3  did not review them.  Indeed, her report references Plaintiff's
4  "history" of various ailments.  (Id.)  The report also indicates
5  that Dr. Eriks relied on "formal testing" in her physical
6  examination of Plaintiff.  (AR 259.)  Nothing in the law required
7  that Dr. Eriks's examination of Plaintiff include laboratory
8  tests.

9       Moreover, Dr. Eriks's assessment was supported by the
10  evidence in the record, which reflected conservative treatment of
11  Plaintiff's back and hip pain.  (See, e.g., AR 310, 338, 350,
12  357.)  As the ALJ noted, Dr. Eriks's opinion also was consistent
13  with that of the medical consultants who reviewed Plaintiff's
14  file.  (See AR 285 (finding no restrictions or limitations), 289
15  (reconsidering initial finding, reviewing additional data, and
16  affirming finding of no severe impairment).)  The ALJ was thus
17  entitled to rely on Dr. Eriks's opinion.  See 20 C.F.R.
18  §§ 404.1527(c)(4), 416.927(c)(4) (ALJ will generally give more
19  weight to opinions that are "more consistent . . . with the
20  record as a whole").

21          3.   The ALJ did not err in discounting Block's
22               Function Report

23       Plaintiff asserts that the ALJ erred in rejecting her
24  sister's Third-Party Function Report.  (Compl. at 14.)  An ALJ
25  may discount lay-witness opinions by providing reasons "germane"
26  to that source for doing so.  Dodrill v. Shalala, 12 F.3d 915,
27  919 (9th Cir. 1993).  Here, the ALJ provided germane reasons for
28  questioning Block's report, including that her statements were

                                    46

not given under oath, as a lay witness she was not competent to make a diagnosis or argue the severity of Plaintiff's symptoms, and her statements were not wholly supported by the clinical and diagnostic evidence in the record.[58]  (AR 30.)

Nonetheless, the ALJ did not, as Plaintiff asserts, reject Block's report entirely.  He noted that Block, like Plaintiff, acknowledged many activities conducted by Plaintiff on a daily basis and her responsibility for driving Block and caring for grandchildren.  (AR 29-30.)  Moreover, Block's characterizations of her sister's pain and limitations did not suggest a severe impairment.  (See, e.g., AR 169 (cannot lift child or "bend over too long"), id. (previously "could stand longer and walk farther . . . drive farther"), id. (when Plaintiff's "back goes out," "I have to get her a heating pad and rub her back"), 172 ("When her back goes out Jane doesn't exercise.").)  Thus, as the ALJ noted, Block's report is largely consistent with his findings.  (AR 29.)

---

[58]    The ALJ also cited Block's familial and financial interest in Plaintiff's successful application for benefits as a basis upon which to disregard Block's statements.  (AR 30.)  The Ninth Circuit has held that the interest of a family member is not a sufficient basis upon which to reject her testimony.  See Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (that spouse was "interested party" insufficient basis for rejecting her testimony).  Because the ALJ provided other clear, convincing, and germane reasons for rejecting Block's testimony, however, his erroneous reliance on her interest in Plaintiff's receipt of benefits was harmless.  Cf. Valentine, 574 F.3d at 694.

4. <u>The ALJ did not err in finding that Plaintiff's</u>
<u>degenerative disc disease and cellulitis were not</u>
<u>severe</u>

Plaintiff contends that the ALJ improperly labeled her degenerative disc disease as "mild" and failed to recognize that her cellulitis and phlebitis constituted serious and recurring conditions. (Pl.'s Mot. at 4-5, 8.) Neither was error.

a. *Applicable law*

At step two of the sequential evaluation process, the claimant has the burden to show that she has one or more "severe" medically determinable impairments that can be expected to result in death or last for a continuous period of at least 12 months. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5, 96 L. Ed. 2d 119 (1987) (claimant bears burden at step two); <u>Celaya v. Halter</u>, 332 F.3d 1177, 1180 (9th Cir. 2003) (same); §§ 404.1508, 416.908 (defining "physical or mental impairment"); §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (claimants will be found not disabled at step two if they "do not have a severe medically determinable physical or mental impairment that meets the duration requirement"). A medically determinable impairment must be established by signs,[59] symptoms, or laboratory findings; it cannot be established based solely on a claimant's own statement of her symptoms. §§ 404.1508, 416.908; <u>Ukolov</u>, 420

_____

[59] A "medical sign" is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques." <u>Ukolov</u>, 420 F.3d at 1005 (quoting SSR 96-4p, 1996 WL 374187, at *1 n.2 (July 2, 1996) (internal quotation marks omitted)); <u>accord</u> §§ 404.1528(b), 416.928(b).

F.3d at 1004-05; SSR 96-4p, 1996 WL 374187, at *1 (July 2, 1996); see also 42 U.S.C. § 423(d)(3) ("physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques").

To establish that a medically determinable impairment is "severe," moreover, the claimant must show that it "significantly limits [her] physical or mental ability to do basic work activities."[60]  §§ 404.1520(c) 416.920(c); accord §§ 404.1521(a), 416.921(a).  "An impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis in original and internal quotation marks omitted); see also Smolen, 80 F.3d at 1290 ("[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims.").  Applying the applicable standard of review to the requirements of step two, a court must determine whether an ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments.  Webb, 433 F.3d at 687.

---

[60]  As the ALJ noted (AR 27-28), "[b]asic work activities" include, among other things, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; [u]nderstanding, carrying out, and remembering simple instructions"; using judgment; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." §§ 404.1521(b), 416.921(b); accord Yuckert, 482 U.S. at 141.

1              b.   *Analysis*

2          Plaintiff contends that the ALJ improperly labeled her

3     degenerative disc disease as "mild." (Pl.'s Mot. at 4-5.)  In

4     support of her contention that the disease was in fact "severe,"

5     Plaintiff points to the May 17, 2010 MRI of her spine, her

6     Function Report, and the May 18, 2011 Physical Residual

7     Functional Capacity Questionnaire. (Id.)  Plaintiff correctly

8     notes that the MRI found both "mild degenerative disc disease at

9     the L4-L5" and "moderate degenerative disc disease at L5-L6 and

10    L6-S1." (AR 292.)  However, neither the MRI report nor any other

11    evidence in the record supports her claim of "severe" disease

12    "significantly limit[ing] my ability to perform physical

13    functions such as standing, sitting, lifting, pulling and

14    bending." (Pl.'s Mot. at 5.)  Rather, as noted above,

15    Plaintiff's physicians recommended imaging for diagnosis,

16    physical therapy, and medication to control the pain. (AR 310,

17    338, 350, 357.)  See §§ 404.1529(c)(3)(iv)-(v),

18    416.929(c)(3)(iv)-(v) (ALJ may consider effectiveness of

19    medication and treatment in evaluating severity and limiting

20    effects of impairment); Warre, 439 F.3d at 1006; Parra, 481 F.3d

21    at 751.

22         Her statements in her Function Report, as discussed above,

23    tend to confirm that Plaintiff's back issues were not severe, as

24    they showed a relatively active lifestyle, management of many

25    responsibilities, and rare need for assistance or accommodation.

26    (See, e.g., AR 176-77 (noting many daily activities), 178 (noting

27    accommodation of limitations), 179 (noting that Plaintiff goes

28    out daily and to market repeatedly each week).)  As noted above,

                                  50

the Questionnaire does not merit remand, nor is it consistent
with the evidence in the record.  (See, supra, Section VI.B.1.)[61]

Plaintiff also asserts that the ALJ erred in not recognizing
that her cellulitis and phlebitis constituted serious and
recurring conditions.  (Pl.'s Mot. at 8.)  Plaintiff points to
the evidence in the record of cellulitis, varicosities,
phlebitis, and thrombophlebitis and the doctors' instructions to
use compression stockings, elevate her legs, and avoid lengthy
trips.  (Id.)  Although the record indeed reflects these
diagnoses and recommendations, the ALJ correctly noted that at
the time of the hearing, "there [we]re no recent episodes of
cellulit[i]s or documentation of impairment related problems
caused by poor circulation."  (AR 29.)  Rather, the record
reflects effective treatment of the swelling, varicosities, and
cellulitis in Plaintiff's lower extremities.  (See AR 239
(treated with antibiotics), 241 (treated with antibiotics), 218
(treated with antibiotics, instructed to elevate legs and avoid
long car trips), 249 (treated with antibiotics and compression
stockings and instructed to elevate legs twice daily), 301
(instructed to manage with heat, ibuprofen, frequent sitting and
elevation of legs, and support hose).)  The ALJ properly relied
on such evidence of conservative treatment to discount

[61]    Given the "de minimis" requirements of step two, see
Smolen, 80 F.3d at 1290, the ALJ may have erred in not finding
Plaintiff's degenerative disc disease impairment to be severe.
Any error was necessarily harmless, however, because he
considered evidence of her back ailments in determining whether
she was disabled.  Cf. Lewis v. Astrue, 498 F.3d 909, 911 (9th
Cir. 2007) (step-two error harmless when ALJ accounts for
resulting limitations later in evaluation process).

Plaintiff's testimony regarding the severity of her alleged impairments.  See Parra, 481 F.3d at 751.  Indeed, Plaintiff herself confirmed that it had "been a while" since she had "problems with the cellulitis," attributing the improved condition of her legs to the compression stockings prescribed for her.  (AR 47.)  The successful treatment of Plaintiff's cellulitis and related issues supports the ALJ's finding that those problems did not constitute a severe medically determinable impairment.[62]  See §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (ALJ may consider effectiveness of medication and treatment in evaluating severity and limiting effects of impairment); Warre, 439 F.3d at 1006.

Moreover, although Plaintiff underscores that she has adapted her daily activities to accommodate the problems in her lower extremities (Pl.'s Mot. at 8-9), both the record and her motion demonstrate that those adaptations have been minor and effective (see, e.g., id. at 9 (sitting or leaning into sink to prepare meals); AR 178 (sister helps when needed with lifting heavy items and tasks requiring bending), 47 (Plaintiff wears

---

[62]  Although the ALJ failed to identify Plaintiff's issues with her lower extremities as medically determinable impairments (AR 27), he treated them as such, including them in his analysis of whether Plaintiff had an impairment or combination of impairments that had significantly limited her ability to perform basic work-related activities (see AR 29, 31).  Their initial exclusion was thus harmless error.  See, e.g., Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion"); cf. Lewis, 498 F.3d at 911 (step-two error harmless when ALJ later accounts for resulting limitations).

compression stockings to control issues with lower extremities),
48 (she avoids standing for long periods of time and elevates
legs to relieve pain and circulatory issues), 50-51 (she shifts
while sitting and gets up every hour to avoid discomfort)).
Thus, although the record reflects issues with Plaintiff's lower
extremities, it also reflects that she was able despite those
issues to maintain a reasonably active life, undermining her
assertion that those problems were disabling or even severe.

     5. <u>The ALJ's assessment of Plaintiff's medical
records was complete and included consideration of
the combined effect of Plaintiff's impairments
upon her ability to work</u>

Plaintiff contends that the ALJ's analysis was incomplete
and that he failed to properly consider the combined effect of
Plaintiff's impairments upon her ability to work. (Pl.'s Mot. at
3-4, 9.) Neither of these contentions warrants reversal.

Although Plaintiff contends the ALJ's analysis of her
medical records was "incomplete," she does not point to any
records that were before the ALJ but not reviewed. First, she
disputes that she has reported that her asthma was "controlled
with an Albuterol inhaler" (AR 29), noting that it is her Flovent
steroid inhaler that controls her asthma and that the ALJ failed
to mention Flovent. (Pl.'s Mot. at 4.) Plaintiff's insistence
that her albuterol inhaler was for emergency use only is belied
by medical records prescribing it "as needed" or "p.r.n."[63] (<u>See,</u>

---

[63] The Latin term <u>pro re nata</u>, meaning "when necessary,"
is abbreviated in medical records "p.r.n." <u>See</u> <u>Stedman's Medical
Dictionary</u>, <u>supra</u>, at 1445.

e.g., AR 251 (noting use of albuterol "as needed"), 310
(prescribing continued use of albuterol p.r.n.), 326 (same), 334
(same).)  Regardless, Plaintiff stated in forms, testimony, and
motion papers that her asthma was controlled by medication.  (AR
187, 189, 258.)  The ALJ's error, if indeed it was one, was thus
harmless (see, e.g., Wright v. Comm'r of Soc. Sec., 386 F. App'x
105, 109 (3d Cir. 2010) (Tashima, J., sitting by designation)
(ALJ's misstatements in written decision harmless when regardless
of them "ALJ gave an adequate explanation supported by
substantial evidence in the record")), and his determination that
her asthma was not severe is supported by the record, §§
404.1529(c)(3)(iv); 416.929(c)(3)(iv) (ALJ may consider
effectiveness of medication in evaluating severity and limiting
effects of impairment); Warre, 439 F.3d at 1006.

Second, Plaintiff contends that the ALJ failed to consider
records supporting a diagnosis of IBS, citing alleged diagnoses
by two physicians.  (Pl.'s Mot. at 4.)  In fact, the ALJ properly
found that the record did not support a diagnosis of IBS.  (AR
29.)  Although Plaintiff alleged IBS in her Function Report (AR
188), she submitted no records documenting the alleged diagnosis
by her former gastroenterologist (see Pl.'s Mot. at 4) or
diagnosis by any other medical provider.  She concedes that "the
exact cause" of her symptoms had not been determined.  (Id.)  As
discussed above (see, supra, Section VI.B.1), the record of her
June 12, 2012 visit to Dr. Tavassoli, attached to Plaintiff's
Complaint, was not before the ALJ or the Appeals Council, does
not merit remand, and in any event does not reflect diagnosis or
treatment of IBS.  (See Compl. Ex. 1 at 1 (noting "chronic"

"[d]iarrhea secondary to food allergy").)

Plaintiff's alleged symptoms were not sufficient, in the absence of any evidence of diagnosis or treatment for IBS, to establish it as a medically determinable impairment. See Ukolov, 420 F.3d at 1005 (quoting SSR 96-4p, 1996 WL 374187, at *1 (July 2, 1996)); §§ 404,1508, 416.908 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.").

Relatedly, Plaintiff asserts that the ALJ failed to consider her multiple disabilities and interrelated conditions, which she asserts combined to significantly limit her ability to work.[64] (Pl.'s Mot. at 9); see §§ 404.1521, 416.921, 404.1523, 416.923. Plaintiff specifically notes her alleged ADD, her cellulitis (and alleged four-day hospitalization in 2006 and 2012 treatment), and the interrelationship between her back, gastrointestinal, and respiratory ailments.[65]  (Pl.'s Mot. at 9-10.)

In fact, the ALJ's decision shows that he considered these

---

[64]   Plaintiff's contentions as to the transferability of her skills are not relevant to step two but rather to step five, which the ALJ did not reach because he found Plaintiff's impairments not severe. (See AR 26-27 (setting forth steps in analysis), 27 (finding no severe impairments).) See, e.g., McDermott v. Astrue, 387 F. App'x 732, 733 (9th Cir. 2010) (noting ALJ's consideration of claimant's transferable skills at step five).

[65]   Plaintiff alleges that her issues with her back and spine "can cause acid-reflux/GERD episode, which in turn, can induce an asthma episode/attack.  Keeping my spine straight at night is essential due to my GERD, which, when in reflux can awaken me with asthma and have sent me to the ER, thinking that I had pneumonia, when it was severe tree allergies." (Pl.'s Mot. at 10.)

alleged impairments and the support, or lack of support, for them in the record.  As an initial matter, the ALJ expressly noted that Plaintiff did not have "an impairment or combination of impairments" limiting her ability to work.  (AR 27 (emphasis added).)  Indeed, he considered Plaintiff's alleged back and joint pain (AR 29 (alleged problems with lifting inconsistent with reported activities), 31 (noting imaging of spine in 2009 and 2010 and resultant diagnosis of degenerative disc disease), id. (hip and back pain "controlled")); asthma (AR 29 (controlled with inhaler, no hospitalization or emergency treatment), 31 ("controlled," no emergency treatment, mild symptoms)); problems in her lower extremities (AR 29 (no recent issues with cellulitis or poor circulation)); carpal tunnel syndrome (AR 29 (no diagnosis, no longitudinal history of complaints or treatment), 31 (noting sole mention assessed normal hand function and strength and only possible mild incidence of the ailment));[66] IBS (AR 29 (no diagnosis in record)); rosacea (AR 31 (noting treatment, "controlled")); GERD (AR 31 (noting treatment, "controlled")); and ADHD (AR 32 (examination revealed no mental impairments)).  The ALJ also considered impairments not alleged but for which he found medical evidence in the record.  (See, e.g., AR 31 (noting blood pressure "slightly elevated" at times but also often within normal limits), id. n.1 (obesity not a severe impairment).)  Having considered these alleged impairments alone and in combination, the ALJ reasonably determined that Plaintiff's medically determinable impairments did not

_____

[66]    Plaintiff acknowledged in her Complaint that she does not have carpal tunnel syndrome.  (Compl. Attach. at 3.)

significantly limit her ability to perform basic work-related activities.  (AR 27.)  Reversal is not warranted.  See Reddick, 157 F.3d at 720-21 ("If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.).

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[67] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: December 19, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[67]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

57